THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
BERT THOMAS *et al.*, Defendants-Appellants.

First District (5th Division)    No. 79-850

Opinion filed May 15, 1981.

Ralph Ruebner and Rafael Schwimmer, both of State Appellate Defender's Office, of Chicago, for appellants.

Richard M. Daley, State's Attorney, of Chicago (Marcia B. Orr, Joan S. Cherry, and Gine P. Naughton, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE MEJDA delivered the opinion of the court:

Defendants Thomas Bernardo (Bernardo)[1] and his brother, Bert Thomas (Thomas), were tried by a jury and found guilty of rape and not guilty of robbery. (Ill. Rev. Stat. 1977, ch. 38, pars. 11—1 and 18—1.) Thomas was sentenced to a term of 10 to 20 years and Bernardo to a term of 16 years.

---

[1] Alternatively referred to in the record as Bernardo Thomas.

On appeal, defendants contend that: (1) the State failed to prove them guilty of rape beyond a reasonable doubt; (2) the court erred in denying defendant Thomas' request for a 24-hour continuance; (3) evidence that Thomas was under "surveillance" for some time prior to the offense denied both defendants a fair trial; and (4) the court, when sentencing Thomas, improperly considered his then pending indictment for rape of another victim. We affirm.

On November 28, 1978, the instant case was called for trial and defense attorney Graham answered ready for trial and that he was appearing on behalf of himself and his partner Ewell. Jury selection was then conducted. The court recessed until the following day when Thomas personally addressed the court. He stated that he did not have proper counsel and that his attorney, Mr. Ewell, wasn't present. He indicated to the court that Mr. Graham, Ewell's partner, could not properly represent him because he wasn't familiar enough with the case. The prosecutor argued that the case had been pending over a year and a half and that Graham had been associated with the case since August. Graham acknowledged that since August 22 the prosecutor had tendered all discovery to him but this was in regard to Bernardo. While Thomas maintained that he had not spoken to anyone concerning a defense, Graham stated that he talked with Thomas "to some extent." Graham indicated that Ewell had intended to be present but his presence was required in Springfield as a State Representative but that he would be back on Thursday. The trial court then denied defendant's request for a continuance and indicated it had previously spoken to Ewell on Monday and informed him that nothing would be done on Monday, that jury selection would take place on Tuesday, that the trial would commence on Wednesday, and that Ewell expressed no objection to the schedule. The court also indicated that if necessary it would give Graham sufficient time to confer with Thomas.

The complainant testified that on July 22, 1977, she was then 17 years old, had only been in the United States 9 years and had immigrated from Haiti. On that date about 8:30 p.m. she went to the drugstore at 55th and Lake Park Avenue. As she entered the store, Bernardo greeted her and she returned the greeting. As she left the store, he again approached her and talked to her about a party. She asked where the party was, and he told her to come to the car so that he could write down the address. She went back to his car and noticed Thomas in the back seat. On direct examination she stated that Bernardo "put" her in the car, while on cross-examination she explained that Bernardo opened the door and at his request she stepped in and sat in the front seat. Bernardo told her he was going to take her home. She replied that she lived nearby and that it was

unnecessary to drive her home, but Bernardo insisted and drove away with complainant and Thomas in the car.

Complainant further testified. The car proceeded down 51st Street, making several stops for red lights, onto the Dan Ryan Expressway and then south. Defendants told the complainant that they were going to their grandmother's house. She responded that she had to get home so that she could let her sister in. On cross-examination she recalled that as they neared the 100th Street exit, she began praying in a foreign language. Bernardo told her to shut up, and Thomas began hitting her. The car continued and then stopped in a wooded area. Bernardo instructed her to get out. When they got out, she began protesting that defendants were going to hurt or rape her. A few feet from the car defendants instructed her to take off her clothes. She pleaded with them not to hurt her, claiming she was pregnant, although she was not. Defendants told her to shut up while Thomas picked up a tree branch and began hitting her. Bernardo made her take off her pants and unzipped his pants. Bernardo then unsuccessfully attempted to have intercourse because she would not let him.

Complainant complained that the mosquitoes were biting her, so defendants brought her back to the car. On the way back they released her hand and she attempted to run away but defendants grabbed her and made her get back in the car. Bernardo again instructed her to take off her clothes. On cross-examination she stated that he took off her clothes and then undressed himself. After both defendants had intercourse with complainant, they prepared to leave. Bernardo placed the seatbelt around her while Thomas, seated in the back seat, hit her.

Bernardo stopped the car at 53rd and Ellis Avenue and told her that he would leave Thomas with her and warned her not to call the police or they would tell the police she had "conned" them by buying some reefers and not paying for them. Thomas then raped her again. Afterwards, while he was pulling on his pants, she said that she could not breathe. Thomas told her to open the window, but instead she opened the car door, ran out and stopped the first oncoming car. As the driver drove off with her, Thomas ran after the car shouting, "That's my wife, that's my wife, and don't listen to her." Complainant was driven to a University of Chicago security car at 53rd and Kenwood Avenue. After reporting the incident, she was taken to the hospital.

Three days later two police officers visited her and showed her photographs. She recognized one of the photographs as that of Thomas. Three months later she viewed a lineup where she recognized and picked out Bernardo.

William Grames, a University of Chicago security guard, testified

that while on patrol on July 22, 1977, he was flagged down by a man and a lady. After speaking with complainant, he made a radio broadcast alerting listeners to look for two black males in a green auto last seen at 53rd and Ellis.

Maurice Hodges, another University of Chicago security officer, testified. He received Officer Grames' broadcast in which Grames stated he was in pursuit of two rape suspects and asked for assistance and proceeded to 55th and Cottage Grove where he saw two black males in a green foreign car. Hodges, in uniform, pulled his car about two feet in front of the green car and turned on his mars lights. He kept the suspects in full view and told them to get out of the car. The two suspects slowly exited the car and immediately ran down the street. Hodges identified defendants as the suspects by pointing them out in court. The prosecutor asked if Hodges had ever seen defendants before. Hodges responded that he had seen Thomas in the area on at least two different times and had kept him under surveillance. Defense counsel then objected to the relevancy of this testimony. The court ruled that it was relevant to prove identification. Hodges, on cross-examination, testified that his security car was white with a maroon decal on the side and that it was not a typical Chicago police squad car. After Hodges' testimony, the court recessed until 10:30 the next day at which time defense counsel Ewell was present.

The parties stipulated that if Rodney Black, a chemist and micro-analyst for the Chicago Police Department, testified he would testify that specimens from a cervical smear of the victim tested positive for human spermatozoa. It was further stipulated that the car in the State's photograph in evidence was registered to Bernardo.

Angela Billips testified on behalf of defendants. She was with defendants on July 22, 1977. Bernardo was driving, she was in the front seat, and Thomas was in the back. They stopped while Thomas went into the drugstore and when he returned the complainant was with him. The four drove to a wooded area off the expressway where Thomas and complainant left the car, saying they would be back shortly. About five minutes later they returned. Ms. Billips testified that they then drove to her house where she and Bernardo went in. Thomas and complainant stayed in the car and she did not see the girl again that evening. On cross-examination Ms. Billips testified that she had known Bernardo for three years but didn't date him. She did not know defendants had been arrested following the incident, although she had seen them thereafter. Until a month before trial, she had never told anyone that she was with defendants on July 22, 1977. She did not think there was anything unusual about what happened that night.

Thomas testified that he had gone to the drugstore with his brother Bernardo and his brother's fiancee, Angela Billips. He saw the complainant in the store where he struck up a conversation with her, and she came back to the car voluntarily. According to Thomas, he and the complainant began to kiss and caress, when she suggested that they drive out to the woods and have some fun. They drove out to a wooded area where he and complainant left the car. They walked a short distance, agreed on a spot, and she began undressing. She then began to complain about the mosquitoes so they went back to the car. Thomas stated that Ms. Billips indicated she was not feeling well and wanted to go home. They then drove to her house and Bernardo and Ms. Billips went inside.

Thomas further testified that while the others were gone he and complainant had sex in the car. After having sex, she asked him for money. He told her it was not worth it, that he had got what he wanted and that she should get out. She then left the car. Thomas waited in the car until his brother came back and then they drove off. Suddenly a white car came out of nowhere and stopped in front of them. "One guy" waived a gun and said, "You black M.F.'s get out of there." Thomas testified that they were scared so they got out of the car and ran. He did not see the man wearing a uniform nor did he see any markings on the car. He did not take any money from complainant nor did he hit her. His brother Bernardo did not have intercourse with complainant.

The jury returned a verdict finding defendants guilty of rape and not guilty of robbery. At the sentencing hearing, the State in aggravation introduced a certified copy of Bernardo's prior conviction of attempt murder. The State then called Ms. "C" in aggravation as to Thomas. Defense counsel objected, noting that Ms. "C" was the complainant in a pending indictment against Thomas, charging an offense about six weeks prior to the date of the instant case. The court overruled the objection and held the evidence admissible so long as the State dropped the pending charge.

Ms. "C" testified that on May 31, 1977, she was then 17 years old and was raped by Thomas. Thomas and others had taken her south on the Dan Ryan Expressway. After they exited the expressway, she was told they had to walk through some big bushes to get to their grandmother's house. While out of the car, Thomas struck her and forced her to have sex. Defense counsel then cross-examined Ms. "C."

Following arguments in aggravation and mitigation, the court sentenced Thomas under the prior code to a prison term of 10 to 20 years and Bernardo under the new code to a sentence of 16 years in the Illinois Department of Corrections.

I

Defendants first contend that they were not proved guilty beyond a reasonable doubt because complainant's testimony was less than convincing and that there was insufficient corroboration. They argue that their corroborated account that she consented to have sex with Thomas and never had sex with Bernardo refutes any guilt. Defendants maintain that the record establishes that the complainant met Bernardo in the drugstore where he invited her to a party and she agreed to walk to his car. She allegedly upon leaving the drugstore entered the car making no complaints. She sat in the front seat while they drove off. During this time she made no outcry for help nor did she attempt to escape. The State maintains that the complainant's shocked condition, her prompt complaint, defendants' use of force against her, their flight when stopped by the security officer and the abandonment of their automobile refutes any possible defense on the grounds of consent.

■■■ To prove a charge of rape, the State must show that intercourse was committed by force and against the will of the female. (*People v. Cornes* (1980), 80 Ill. App. 3d 166, 399 N.E.2d 1346; *People v. Genus* (1979), 74 Ill. App. 3d 1002, 393 N.E.2d 1162.) There is no definite standard fixing the amount of force required to show nonconsensual intercourse, and each case must be considered on its own factors. (*People v. Walsh* (1980), 80 Ill. App. 3d 754, 400 N.E.2d 587; *People v. Genus.*) If the circumstances show resistance to be futile or life endangering, or if the complainant is overcome by superior strength or paralyzed by fear, useless or foolhardy acts of resistance are not required. (*People v. Genus.*) Furthermore, to obtain a conviction for rape, the complainant's testimony must be either clear and convincing or independently corroborated. (*People v. Genus.*) One form of corroboration is the timely reporting of such incident to the police. (*People v. Secret* (1978), 72 Ill. 2d 371, 381 N.E.2d 285; *People v. Genus.*) However, if positive and credible, the complainant's testimony alone is sufficient to sustain a conviction for rape. (*People v. Genus.*) Minor variances in the testimony may occur and such variances are mere discrepancies which go only to the issue of credibility. (*People v. Barr* (1980), 85 Ill. App. 3d 992, 407 N.E.2d 782; *People v. Thompson* (1978), 57 Ill. App. 3d 134, 372 N.E.2d 1052.) As such, it is the function of the trier of fact to judge the credibility of the witnesses and the weight of the evidence. *People v. Payton* (1980), 84 Ill. App. 3d 181, 405 N.E.2d 18.

Defendants, relying on *People v. Taylor* (1971), 48 Ill. 2d 91, 268 N.E.2d 865, argue that somewhat similar testimony as to their initial confrontation with the victim was held to be insufficient to sustain a conviction for forcible rape. *Taylor* is distinguishable. There the com-

plainant testified that when defendant ordered her into his car he stated he had a gun, although she admitted not seeing a gun at any time. That court concluded that the complainant knew from the beginning that her safety was in danger, and although the parking lot was well lit, she made no attempt to resist. The court held that the facts fell short of proof that she was paralyzed by fear. In the present case, complainant had no cause for alarm at the time she entered defendants' car.

The present situation is factually similar to *People v. Sims* (1972), 5 Ill. App. 3d 727, 283 N.E.2d 906. There the defendant asserted that because the victim accompanied two previously unknown men in a car and did not make an outcry for help or attempt to escape, the inference can be drawn that she consented to the intercourse. The court held that although the girl was foolhearted in accompanying strange men, she had no cause for alarm until they had ceased following another car in which her sister and friends were riding. "It was only when her car came to a halt in the scheduled area that her safety was definitely jeopardized. The automobile windows were closed and there were no people in the vicinity. Escape would have been impossible—outcries useless." 5 Ill. App. 3d 727, 730, 283 N.E.2d 906, 908.

■■ Here, the complainant was a 17-year-old girl who had only been in the country for nine years. She had no cause for alarm until defendants failed to take her home. Defendants had represented that they were taking her to their grandmother's house and while on the expressway she could have felt relatively safe. It was not until they parked in a secluded area that she realized she might be raped. At this point she pleaded with defendants not to hurt her and claimed to be pregnant in an attempt to persuade them not to rape her. Initially, she successfully resisted while in the woods and actually tried to escape while returning to the car, feigning that it was because of mosquitoes. Her testimony indicates that she resisted to the best of her ability. Her resistance was supported by her testimony that Bernardo told his brother that he could not penetrate her because she was not "acting right." Where an outcry by the victim is useless or restrained by fear, the failure to do so does not indicate consent. (*People v. Jones* (1976), 40 Ill. App. 3d 850, 353 N.E.2d 375.) Her testimony indicates that she resisted to the best of her ability and that she attempted to escape. The secluded area made escape impossible and outcries useless.

Defendants also argue that the State failed to present sufficient corroboration in that the passing motorist was never called to testify and that no medical evidence was presented to corroborate her testimony that she had been hit while sitting in the car.

■■ Complainant's testimony was not only clear and convincing but it

was sufficiently corroborated so as to establish defendants' guilt beyond a reasonable doubt. Once complainant escaped she immediately hailed a passing motorist who took her to the police. Thereafter they stopped William Grames, a security officer for the University of Chicago, and she reported what had just occurred. Grames testified that the victim was crying and upset. She was taken to the hospital where a cervical smear of the victim testified positive for human spermatozoa. Grames then reported over his radio that he was in pursuit of a green car occupied by two black men. Defendants' car was stopped in the vicinity. Upon exiting the car, both defendants ran and never returned for the car. Evidence of flight from the police is a "form of circumstantial evidence based upon the inference that such a response had a reasonable relation to consciousness of guilt." *People v. Harris* (1972), 52 Ill. 2d 558, 288 N.E.2d 385; *People v. Watson* (1975), 28 Ill. App. 3d 786, 329 N.E.2d 512.

Furthermore, evidence of injury to the victim's body is not necessary to sustain a conviction for rape. (*People v. Jones* (1976), 40 Ill. App. 3d 850, 353 N.E.2d 375.) In *Jones*, the defendant's conviction for rape was sustained, notwithstanding that there was no evidence of bruises or scrapes or damage to her clothing. That court noted that the victim's prompt report to the police and her statement "They raped me" served to corroborate her testimony and was sufficient to sustain the conviction.

Complainant's testimony was clear and convincing and corroborated by her prompt report to the security officers and the test results. Defendants' version of the incident seems incredible in light of the fact they fled from the security officer and never returned for their automobile. Ms. Billips' testimony is also questionable since she never told anyone about being present in the car on July 22, 1977, until a month before trial. She also indicated she had known Bernardo for three years but that they did not date. However, Thomas testified that she was Bernardo's fiancee. Accordingly, there is sufficient evidence in the record to establish beyond a reasonable doubt that defendants raped complainant.

## II

Thomas next contends that the court erred in denying his request for a 24-hour continuance to obtain counsel of his choosing.

After jury selection and prior to any witness testifying, Thomas asked the court for a continuance so that attorney Ewell could appear on his behalf. While an accused has the constitutional right to be represented by counsel of his choosing, this right cannot be employed as a weapon to indefinitely thwart the administration of justice or to otherwise embarrass the effective administration of justice. (*People v. Friedman* (1980), 79 Ill.

2d 341, 349, 403 N.E.2d 229, 234; *People v. Solomon* (1962), 24 Ill. 2d 586, 182 N.E.2d 736.) Section 114—4(g) of the Illinois Code of Criminal Procedure also provides that during the time the General Assembly is in session, the court shall grant a continuance where the party or his attorney is a member of either house of the General Assembly and whose presence is necessary for the full, fair trial of the cause. (Ill. Rev. Stat. 1977, ch. 38, par. 114—4(g).) Nevertheless, a motion for continuance is directed to the court's discretion, and a defendant challenging the denial of such motion must show that he was prejudiced at trial by its refusal. (*People v. Dalzotto* (1977), 55 Ill. App. 3d 995, 371 N.E.2d 859; *People v. McGee* (1977), 49 Ill. App. 3d 523, 364 N.E.2d 546; Ill. Rev. Stat. 1977, ch. 38, par. 114—4(e).) Accordingly, the determination of whether the denial of a continuance violates a substantive right of the accused must turn on the particular facts of the case. *People v. Friedman*; *People v. Lott* (1977), 66 Ill. 2d 290, 362 N.E.2d 312.

Thomas relies on *People v. Green* (1969), 42 Ill. 2d 555, 248 N.E.2d 116, and *People v. Myles* (1977), 49 Ill. App. 3d 325, 364 N.E.2d 323, to support his position that the trial court erred in forcing him to proceed with Graham as his counsel where Graham indicated that he was not fully prepared to try the case. However, both these cases are distinguishable.

In *People v. Green* the defendant appeared in court on the day of trial and asked for a short continuance because his attorney was on a case out of town. The court denied the request and appointed a public defender, who had no opportunity to investigate the case, to represent him the same day. Unlike *Green*, Graham was familiar with the case. He had personally received all discovery since August and was representing Bernardo on the same charges. The trial court also indicated that Graham would be given sufficient time to confer with Thomas if necessary. Thomas also had allowed Graham to represent him during jury selection. Finally, Graham was Ewell's partner.

In *People v. Myles* defendant's conviction for murder was reversed because the trial court forced her to go to trial with an admittedly inexperienced, newly admitted attorney who had never tried a felony case. In the present situation Graham was a highly experienced trial lawyer who was familiar with the case. He was representing Thomas' brother on the same charges. The record shows that Graham competently handled the opening statement, that he was familiar with the complainant's testimony, and that he conducted an intensive cross-examination. Additionally, Ewell conducted Thomas' defense beginning with the second day. Under the circumstances it does not appear that Thomas' right to counsel was violated nor that Thomas suffered any prejudice from the failure to grant his continuance.

## III

Defendants next contend that the statement of the security guard for the University of Chicago that he had kept Thomas under surveillance for some time prior to the offense so prejudiced the jury as to abridge both defendants' right to a fair trial. Defendants argue that this statement raises a strong inference that Thomas had been suspected of crimes other than the one with which he was charged. The State submits that this contention is without merit in that the prosecutor never attempted to elicit that Thomas had a criminal record or that he had any propensity to commit the crime charged.

■■ While evidence of crimes other than the one for which the accused is being tried is not admissible to establish a probability of his guilt by inferring that he is a man of criminal disposition and therefore had a propensity to commit the crime charged (*People v. Lehman* (1955), 5 Ill. 2d 337, 125 N.E.2d 506; *People v. Butler* (1978), 63 Ill. App. 3d 132, 379 N.E.2d 703), it is admissible if offered for some other purpose, such as to impeach the credibility of the accused or to prove motive, intent, identity, absence of mistake or *modus operandi. People v. Glidewell* (1979), 78 Ill. App. 3d 734, 397 N.E.2d 544; *People v. Butler.*

Relying on *People v. Harges* (1967), 87 Ill. App. 2d 376, 231 N.E.2d 650, defendants argue that it was improper for the State to elicit the fact that the police had kept Thomas under surveillance. It should first be noted that the witness was not a police officer but a security guard for the University of Chicago. Nevertheless, *Harges* is distinguishable. There the defendant's conviction was reversed because the State committed reversible error when it asked defendant on cross-examination whether he had ever seen the police station before. That court found that the prosecutor's question was an obvious attempt to bring to the jury's attention the fact that defendant had been at the police station on a prior arrest. The court noted that the questioning was otherwise irrelevant to and unconnected with the testimony given by defendant on cross-examination.

■■ Unlike *Harges*, the State in the instant case did not elicit the response now challenged by defendants. The prosecutor was attempting to establish that the witness had observed defendants in a green car on the night of the incident and that when the witness pulled his security car in front of defendants' car, they abandoned it and fled on foot. To strengthen the witness' credibility, the prosecutor merely asked the follow-up question whether he had seen defendants before. It is generally true that an identification of a defendant is strengthened where it is shown that it is based on numerous observations. (See *People v. Miller* (1971), 2 Ill. App. 3d 206, 276 N.E.2d 395.) As such, there was nothing improper about the form of the question.

Although the question called for a yes or no answer, the witness volunteered the following statement:

"I had seen the one in the brown [Thomas], not no contact, but I had seen him in the area at least two different times. I had kept him under surveillance because—."

At this point the court curtailed the witness' response and defense counsel objected to the relevancy of this "particular incident." The court overruled this objection stating it was relevant as to defendants' identification. Thereafter the only statement made by the witness relating to the "surveillance" was that it occurred over the summer months.

Similar volunteered and unresponsive remarks have been held not to constitute reversible error. (*People v. DuPree* (1979), 69 Ill. App. 3d 260, 387 N.E.2d 391; see also *People v. Butler* (1978), 63 Ill. App. 3d 132, 379 N.E.2d 703.) In *DuPree* the defendant was charged with armed robbery. At trial, the State produced the testimony of a detective. In response to the question, "What happened at that time?" the detective indicated that a person who identified himself as defendant called the station to ask if the detective was looking for him. The detective then stated that he "advised the subject on the phone that I was looking for Mr. DuPree [with] reference to a theft from a house." On appeal, the defendant claimed the answer was intentionally sought to show that defendant was under constant surveillance. That court noted that the remark was a brief unresponsive answer and concluded that the reference to the investigation of a "theft" was harmless error. 69 Ill. App. 3d 260, 264, 387 N.E.2d 391, 393.

■■ Furthermore, the witness' brief, isolated reference to having kept Thomas under surveillance did not specifically implicate Thomas in any wrongdoing or criminal activity. Any inference that Thomas was suspected of other crimes that may have been drawn from the initial statement was effectively rebutted on cross-examination. In response to defense counsel's question "Prior to the time that you drove your car and blocked their progress, had you noticed any violation of the law committed by [defendants]?" the witness stated, "None whatsoever." Accordingly, we find the brief, isolated and unresponsive reference to a surveillance did not deny defendants a fair trial.

IV

Finally, Thomas contends that he should receive a new sentencing hearing where the court based his sentence not only on the instant offense but also on evidence relating to a then pending indictment charging him with rape on May 31, 1977, some six weeks prior to the instant offense.

■■ In determining sentence a court is not bound by the usual rules of evidence but may search anywhere within reasonable bounds for facts

which tend to aggravate or mitigate the offense. (*People v. Dominique* (1980), 86 Ill. App. 3d 794, 408 N.E.2d 280; *People v. Stoutenborough* (1978), 64 Ill. App. 3d 489, 381 N.E.2d 415.) While the court must exercise care to insure the accuracy of the information considered (*People v. Stoutenborough*; see also *People v. Burdine* (1980), 82 Ill. App. 3d 984, 412 N.E.2d 554), it may inquire into the general moral character of the offender, his mentality, his habits, his social environments, his abnormal or subnormal tendencies, his age, his natural inclination or aversion to commit crime, and the stimuli which motivated his conduct. (*People v. Adkins* (1968), 41 Ill. 2d 297, 242 N.E.2d 258; *People v. Dominique*; *People v. Stoutenborough*.) Testimony by witnesses with first-hand knowledge relating to other offenses or other charges can properly be introduced or relied upon by the court when imposing sentence where the witnesses are subject to cross-examination. *People v. Dominique*.

■■ The defendant in *People v. Dominique* presented the identical argument. That court held:

"* * * the testimony of other victims was relevant to defendant's general moral character, his natural inclination or aversion to commit crime and his abnormal or subnormal tendencies * * * [and] that the testimony by the other victims relating to charges pending against defendant was properly introduced at the sentencing hearing and relied upon by the court when imposing sentence." 86 Ill. App. 3d 794, 809, 408 N.E.2d 280, 292.

We find *Dominique* dispositive of the issue and Thomas' contention without merit. See also *People v. Poll* (1980), 81 Ill. 2d 286, 408 N.E.2d 212; *People v. Barksdale* (1976), 44 Ill. App. 3d 770, 358 N.E.2d 1150.

For the reasons stated, the judgment of the trial court is affirmed.

Affirmed.

SULLIVAN, P. J., and LORENZ, J., concur.